Filed 4/24/13  P. v. Upshaw CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>EUGENE LEE UPSHAW,<br><br>    Defendant and Appellant. | B240541<br><br>(Los Angeles County<br>Super. Ct. No. PA068215) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Beverly R. O'Connell, Judge.  Affirmed.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Toni R. Johns Estaville, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

Appellant Eugene Lee Upshaw appeals from the judgment entered following his convictions by jury on count 1 – kidnapping (Pen. Code, § 207, subd. (a)), count 2 – kidnapping to commit oral copulation (Pen. Code, § 209, subd. (b)(1)), count 3 – kidnapping to commit rape (Pen. Code, § 209, subd. (b)(1)), count 4 – kidnapping to commit sodomy (Pen. Code, § 209, subd. (b)(1)), count 5 – forcible oral copulation (Pen. Code, § 288a, subd. (c)(2)), count 6 – forcible rape (Pen. Code, § 261, subd. (a)(2)), two counts of forcible sodomy (Pen. Code, § 286, subd. (c)(2); counts 7 & 9), and count 8 – assault by means of force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(1)), with findings as to counts 5, 6, 7, and 9 that appellant committed aggravated kidnapping (Pen. Code, § 667.61, subd. (d)(2)), and a finding appellant suffered a prior felony conviction (Pen. Code, § 667, subd. (d)). The court sentenced appellant to prison for life with the possibility of parole, plus 200 years to life, plus eight years. We affirm the judgment.

### FACTUAL SUMMARY

1. *People's Evidence.*

Viewed in accordance with the usual rules on appeal (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established that about 10:00 p.m. on August 20, 2009, Nicole B. (Nicole) was in her parked car in the parking lot of a Castaic market. Nicole was in the driver's seat waiting for her sister. Nicole, using her cellphone, called her sister to see where her sister was. Appellant approached and asked for a ride down the street. Nicole, who had intended to buy alcohol, agreed to give appellant a ride if he bought her alcohol. Appellant later entered the market and bought Jack Daniels but Nicole subsequently said she did not drink Jack Daniels.

Appellant became angry, threw Nicole to the front passenger seat, and sat in the driver's seat. He cursed at her, called her degrading names, and said he had spent $20 for alcohol and she was going to drink it. Appellant drove away with Nicole, yelling and cursing at her. Appellant eventually drove onto a deserted road and refused to let Nicole exit. Nicole slowly and unwillingly drank the alcohol.

2

Appellant stopped the car and forced Nicole to orally copulate him. Appellant later grabbed her hair, stopped her, and exited. He went to the passenger side of the car, opened the door, and pulled Nicole out by her hair. Nicole fell and appellant continued pulling her hair, dragging her. Appellant threw her against the front hood of the car, pulled her sweatpants off, and raped her from behind. The two reentered the car, she continued to drink unwillingly, and appellant continued driving down the road.

Appellant stopped again and went to Nicole's side of the car. He pulled her out, dragged her up a hill by her hair, and started choking her. Nicole thought she was going to die. Appellant forcibly sodomized her. The more she protested the rougher he was and the harder he hit her. Nicole eventually ran to the car and entered it, but appellant grabbed her feet and yanked her out, causing her to slam her chin on the bottom of the car.

Appellant later drove Nicole for perhaps five to ten minutes, then stopped. Appellant grabbed her hair, picked her up, slammed her against the car, and forcibly sodomized her for about ten minutes. The two reentered the car, appellant drove her to a location near the market, and left. The entire attack lasted two to three hours.

Nicole testified she had bald patches on her head where appellant had yanked hair out. Appellant gave her a black eye, she had very painful injuries to her chin which took a long time to heal, and she had scrapes and large cuts with scarring on her back. Nicole also had injuries to her left shoulder and arm, bruises to her hips, and multiple bruises and scratches on her thighs and legs. Photographs taken at the hospital and admitted into evidence depicted injuries appellant inflicted upon Nicole.

Maira Ontiveros, the daughter of the market's owner, testified that shortly before 10:00 p.m. on August 20, 2009, she sold alcohol to a man, and later saw the man enter a car, sit in the driver's seat, and drive away. A market surveillance video, admitted into evidence, depicted the man. Los Angeles County Sheriff's Detective David Campbell, the investigating officer in this case, testified Ontiveros told him that after the man exited the market, she saw the man push a woman from the driver's seat onto the passenger's

3

seat, then sit in the driver's seat himself. Campbell showed the video to Nicole, who identified appellant as the man. Campbell denied there was any evidence that Nicole was a prostitute.

Kathy Adams, a registered nurse, a sexual assault nurse examiner, and the director of the center of assault treatment services at Northridge Hospital, testified as follows. About 12:30 p.m. on August 21, 2009, Nicole arrived at the hospital. Adams examined her and saw her numerous injuries. Adams had overseen 11,000 sexual examinations, had reviewed about half of those, and personally had conducted 1,000 sexual examinations. Adams had rarely seen a person with as many injuries as Nicole. Adams testified Nicole was "pretty shaky" during the examination. The most significant injury in Nicole's anal-genital area was the anal swelling. Nicole's anal area was very tender and there was a slight tear on her anus. Adams collected swabs from Nicole's vagina and anus.

Jill Licht, a senior criminalist for the Los Angeles County Sheriff's Department, testified she collected possible semen from the front passenger seat of the car. Campbell testified as follows. In May 2010, Campbell first learned the suspect's name when a DNA database matched DNA obtained from Nicole's anal area to appellant. Appellant was in Missouri and was there in August 2010. On September 16, 2010, Campbell extradited appellant here from New York and interviewed him. Appellant told Campbell that appellant and Nicole had sex and oral sex. Campbell noticed that appellant had cut his hair and had lost weight. Following appellant's arrest, Campbell took a buccal swab from appellant.

Appellant's DNA was found in the vaginal and anal samples taken from Nicole and in the semen sample collected from the front passenger seat. (We later discuss the DNA evidence.)

2. *Defense Evidence.*

In defense, appellant testified as follows. Appellant met Mike at a nearby bar. Appellant previously had not known Mike. About 9:30 p.m., Mike left the bar. Nicole

4

drove up and Nicole and Mike conversed. Mike later asked appellant if appellant wanted to do something later, but appellant replied that appellant had to stay in the area. Mike said, "we are just going to go somewhere like a hotel." Mike said he would talk to "this person" and see what could be arranged. Mike later told appellant that Mike was going to Mike's truck to get something. Appellant asked if appellant needed to buy something, Mike replied yes, and Mike asked appellant if appellant had money. Appellant indicated he did not, so Mike gave appellant $50 and left.

As appellant was entering the market, Nicole motioned appellant to approach her. Nicole asked appellant who he was and said appellant had been talking with Nicole's friend. Appellant explained he had been drinking with Mike all day.

Nicole asked appellant if he wanted a date. Appellant believed Nicole was a prostitute and told her that he did not have enough money. Appellant entered the market and bought Jack Daniels. Nicole later invited him to sit in her car while they waited for Mike. Appellant sat in the front passenger seat, and Nicole sat in the driver's seat. After Mike returned and entered the car, the three were getting ready to leave, she pulled out, but Mike changed his mind and exited.

Appellant indicated he wanted to exit but Nicole told him that they could "hang out." Nicole drove appellant to a motel parking lot and parked. Nicole climbed over the car's console, sat on top of appellant, and, about 12:30 a.m., the two had sex. The two remained in the car in the lot for about two-and-a-half hours. Appellant denied driving Nicole into the desert and denied dragging her from an automobile. He denied striking her, raping her, forcing her to orally copulate him, or forcing her to have sex.

Later, Nicole, who had been drinking, told appellant to drive. Appellant drove Nicole back to the truck stop, appellant told her that he was going to leave, but Nicole pleaded with him to stay. Appellant agreed and, about 2:00 a.m., Nicole drove appellant back to the motel parking lot. While there, the two argued because Nicole would not give the Jack Daniels to appellant. Appellant testified "it kind of escalated to kind of like a

5

little fight or whatever" but later testified neither of them hit the other. Appellant later left.

Appellant initially told Campbell that appellant blacked out and remembered nothing, later told Campbell that appellant remembered some things, and eventually told Campbell that appellant remembered having sex with Nicole. Appellant testified he was a "little buzzed" when he had sex with Nicole but towards the end of the evening he drank more and was on the verge of blacking out. Appellant admitted he had suffered a 1991 arrest "for the rape and sodomy of a female" in New Mexico and a 1995 Texas conviction for felony house burglary.

## ISSUES

Appellant claims (1) the trial court violated his federal right to confrontation by admitting testimony based on a nontestifying declarant's DNA analysis report and (2) the trial court erroneously failed to exclude, pursuant to Evidence Code section 352, evidence of appellant's arrest for rape and sodomy.

## DISCUSSION

1. *No Confrontation Error Occurred.*

a. *Pertinent Facts.*

During trial, Learden Matthies testified on direct examination by the People as follows. Matthies was a supervising criminalist at the Los Angeles County Sheriff's Department crime laboratory in the forensic biology section. That section focused on DNA. Matthies had worked for the department for 13 years and was in that section the entire time. Matthies supervised eight criminalists. Her duties included collecting and preserving physical evidence at crime scenes. In the laboratory, she analyzed that evidence for the presence of biological fluids such as semen and performed DNA typing on them. Criminalists would take a forensic sample of fluids from the crime scene or victim, generate a DNA profile from the sample, and compare it to the DNA profile of a sample taken from a suspect to see if the samples matched. Criminalists also determined

6

statistically how rare or common a profile was. Matthies had testified as an expert in Los Angeles County probably between 40 and 50 times, mostly concerning DNA.

Matthies performed a technical review of the DNA analysis performed by criminalist Susan Sherman. Her report was dated September 14, 2011. To perform a technical review, a criminalist reviewed all paperwork in the case file. The file contained all notes and procedures used during testing and contained the primary analyst's report. The reviewer also examined the actual DNA profiles a second time. Reviewers conducted an independent analysis of the profiles to see if the reviewers agreed with the conclusion of the primary analyst as reflected in the latter's report.

Matthies further testified as follows. Vaginal and anal samples were collected from Nicole, a sperm sample was collected from the vehicle, and a buccal swab was taken from appellant. The vaginal and anal samples, and the sample from the vehicle, contained sperm the DNA profile of which matched appellant's profile. The probability a person other than appellant had that DNA profile was one in ten quintillion.

During cross-examination, Matthies testified as follows. Sherman, not Matthies, performed the DNA analysis on the above discussed samples. Sherman previously had worked for the sheriff's department. Matthies's testimony was based on Sherman's records. During redirect examination, Matthies testified that, as part of her duties as supervisor, she technically reviewed Sherman's work. When Matthies reviewed the work, she reviewed all of the notes in the file that were used to generate the report. She then looked at the DNA profiles, which were generated by specialized software, and she made the same comparisons and read Sherman's conclusions to verify that Matthies agreed with them. Matthies agreed with Sherman's conclusions in this case.

Sherman's documentary report was not admitted into evidence. Sherman did not testify at trial.

7

b. *Analysis.*

Appellant claims the trial court violated his right to confrontation by admitting Matthies's testimony based on the report of Sherman, who did not testify. We conclude otherwise.

(1) *Applicable Law.*

In *People v. Lopez* (2012) 55 Cal.4th 569 (*Lopez*), our Supreme Court summarized *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177] (*Crawford*) and its progeny from the high court. *Lopez* stated *Crawford* "created a general rule that the prosecution may not rely on 'testimonial' out-of-court statements unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination." (*Lopez*, at p. 576, quoting *Crawford*.) *Lopez* stated, "Although the high court in *Crawford* did not define the term 'testimonial,' it made these observations: '[T]he Confrontation Clause . . . applies to "witnesses" against the accused—in other words, those who "bear testimony." [Citation.] "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." [Citation.] An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. . . .' [Citation.]" (*Ibid.*)[1]

---

[1]     Our Supreme Court in *Lopez* stated as follows: "In [*People v. Geier* (2007) 41 Cal.4th 555 (*Geier*)], a laboratory director—relying on a laboratory report prepared by a nontestifying analyst—testified at the defendant's trial that DNA found on vaginal swabs taken from the murdered rape victim matched the defendant's DNA. We unanimously rejected the defendant's argument that the report was testimonial. We said: '[A] statement is testimonial if (1) it is made . . . by or to a law enforcement agent and (2) describes a past fact related to criminal activity for (3) possible use at a later trial. Conversely, a statement that does not meet all three criteria is not testimonial.' [Citation.] Under that test, *Geier* concluded, the report of the nontestifying laboratory analyst was not testimonial and thus admissible, because it was *'a contemporaneous recordation of observable events rather than the documentation of past events'* related to criminal activity. (*Ibid.*)" (*Lopez, supra*, 55 Cal.4th at pp. 576-577, italics added.) "But two years later the high court in *Melendez-Diaz* [*v. Massachusetts* (2009) 557 U.S. 305 [174 L.Ed.2d 314] (*Melendez-Diaz*)] said that a laboratory report may be testimonial,

"In [*Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 [174 L.Ed.2d 314] (*Melendez-Diaz*)], the defendant was charged . . . with cocaine distribution and trafficking." (*Lopez, supra*, 55 Cal.4th at p. 577.) "[T]he prosecution introduced into evidence three ' "certificates of analysis" ' [citation], each prepared by a laboratory analyst and *sworn before a notary public*; these laboratory certificates stated that a substance found in plastic bags in the defendant's car was determined to be cocaine. The defendant was convicted of the charges." (*Ibid*., italics added.)

In a five-to-four decision, the high court "held that the laboratory certificates in *Melendez-Diaz* fell 'within the "core class of testimonial statements" ' [citation], and thus were inadmissible under *Crawford*, . . . The court observed that each certificate was (1) 'a " 'solemn declaration or affirmation made for the purpose of establishing or proving some fact' " ' [citation], (2) 'functionally identical to live, in-court testimony' [citation], (3) ' " 'made under circumstances which would lead an objective witness reasonably to believe that [it] would be available for use at a later trial' " ' [citation], and (4) created 'to provide "prima facie evidence of the composition, quality, and the net weight" ' . . . of the substance found in the plastic bags seized from the defendant's car." (*Lopez*, *supra*, 55 Cal.4th at p. 577.)

In *Bullcoming v. New Mexico* (2011) 564 U.S. ___ [180 L.Ed.2d 610] (*Bullcoming*), a New Mexico defendant was charged with driving while intoxicated. (*Lopez, supra*, 55 Cal.4th at p. 578.) "[T]he prosecution introduced at trial a laboratory analyst's certificate stating that a blood sample taken from the defendant shortly after his arrest contained an illegally high level of alcohol. That analyst did not testify. Instead, the prosecution called as a witness another analyst who had 'neither participated in nor observed the testing.' [Citation.]" (*Ibid*.)

In a five-to-four decision, the high court in *Bullcoming* said "the certificate was ' *"formalized" in a signed document' that made reference to New Mexico court rules*

---

and thus inadmissible, even if it ' "contains near-contemporaneous observations of [a scientific] test" ' [citations]." (*Id.* at p. 581.)

*providing 'for the admission of certified blood-alcohol analyses.'* [Citation.] These 'formalities' [citation] were, in the court's view, 'more than adequate' (*ibid*.) to qualify the laboratory certificate in *Bullcoming* as testimonial, and hence inadmissible. The high court in *Bullcoming* concluded: 'Because the New Mexico Supreme Court permitted the testimonial statement of one witness [(the laboratory analyst who tested the defendant's blood sample)] through the in-court testimony of a second person [(the expert familiar with the laboratory's testing procedures)] we reverse that court's judgment.' [Citation.]" (*Lopez, supra*, 55 Cal.4th at p. 578, italics added.)[2]

In *Williams v. Illinois* (2012) 567 U.S. ___ [183 L.Ed.2d 89] (*Williams*) (decided in June 2012), vaginal swabs from a rape victim contained semen, and the swabs were sent to a Cellmark laboratory in Maryland. Illinois State Police (ISP) forensic biologist Sandra Lambatos testified Cellmark analysts tested the swabs, derived a DNA profile of the man whose semen was on the swabs, and produced a laboratory report containing that profile. Lambatos also testified that in her expert opinion, that profile matched the DNA profile which the ISP laboratory had derived from a sample of the defendant's blood. The report was not admitted into evidence and no Cellmark analyst testified. The defendant was convicted. (*Lopez, supra*, 55 Cal.4th at pp. 578-579.) Illinois courts had stated Lambatos's expert testimony about the report was not offered for the truth of the

---

[2]    In *People v. Thomas* (2012) 53 Cal.4th 771 (decided in February 2012), the defendant claimed an autopsy report and a coroner's testimony based on it were testimonial hearsay the admission of which constituted confrontation error. (*Id*. at p. 802.) Acknowledging *Crawford*, *Melendez-Diaz*, and *Bullcoming*, *Thomas* declined to address the claim, holding instead any such error was constitutionally harmless. (*Thomas*, at pp. 802-803.) We note however that California appellate cases have concluded that extrajudicial statements reasonably relied upon as a basis for expert opinion testimony are nonhearsay the admission of which into evidence does not violate the confrontation clause. (*People v. Cooper* (2007) 148 Cal.App.4th 731, 747 (*Cooper*); *People v. Thomas* (2005) 130 Cal.App.4th 1202, 1209-1210 (*Thomas*); cf. *People v. Ramirez* (2007) 153 Cal.App.4th 1422, 1426-1427; *People v. Fulcher* (2006) 136 Cal.App.4th 41, 55-57.)

10

matter asserted in the report, but only to explain the basis of her expert opinion that the DNA profiles matched. (*Id*. at p. 579.)

In *Williams*, there was no majority opinion but five justices concluded Lambatos's testimony did not violate the defendant's right to confrontation. (*Lopez, supra,* 55 Cal.4th at p. 579.) In a plurality opinion, four of the five justices reached that conclusion by applying the rule that " 'Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause.' " (*Lopez,* at p. 579, quoting *Williams, supra,* 567 U.S. at p. __ [183 L.Ed.2d at p. 99] (plur. opn. of Alito, J.); see fn. 2, *ante*.)[3]

In a separate opinion, Justice Thomas concurred in the judgment solely because, in his view, Cellmark's statements lacked the requisite formality and solemnity to be considered testimonial. (*Lopez, supra*, 55 Cal.4th at p. 580.) Justice Thomas later stated, "I conclude that Cellmark's report is not a statement by a 'witnes[s]' within the meaning of the Confrontation Clause. The Cellmark report lacks the solemnity of an affidavit or deposition, for it is *neither a sworn nor a certified declaration of fact. Nowhere does the report attest that its statements accurately reflect the DNA testing processes used or the results obtained. . . .* The report is signed by two 'reviewers,' but they neither purport to have performed the DNA testing nor certify the accuracy of those who did. . . . And, although the report was produced at the request of law enforcement, it was not the product of any sort of formalized dialogue resembling custodial interrogation."

---

[3]     Alternatively, the plurality opinion stated that "even if the expert's testimony had been admitted for the truth of the matter asserted in the Cellmark laboratory's report, the report was not testimonial (and hence the expert's testimony about the report was admissible) because it was not prepared 'for the primary purpose of accusing a targeted individual.' [Citation.] Indeed, the plurality noted, the defendant was not yet a suspect at the time the report was produced. [Citation.]" (*Lopez, supra,* 55 Cal.4th at p. 579, quoting *Williams*.)

11

(*Williams*, *supra*, 567 U.S. at p. ___ [183 L.Ed.2d at pp. 133-134] (conc. opn. of Thomas, J.), italics added.)

Finally, in *Lopez* (decided in October 2012), the defendant was charged with vehicular manslaughter while intoxicated and, to prove her intoxication, the People introduced into evidence a report of laboratory analyst Pena reflecting the percentage of alcohol in a blood sample taken from the defendant two hours after the accident. Pena did not testify, but a colleague and expert witness, Willey, did. A jury convicted the defendant. (*Lopez*, *supra*, 55 Cal.4th. at p. 573.) *Lopez* concluded that "the critical portions of that report were not made with the requisite degree of formality or solemnity to be considered testimonial." (*Id.* at p. 582.)

The last five pages of the six-page report in *Lopez* consisted of printouts of data from a gas chromatograph which measured calibrations, quality control, and the concentration of alcohol in a blood sample. (*Lopez*, *supra*, 55 Cal.4th. at p. 583.) *Lopez* concluded that since that machine could not be cross-examined, introduction of the printouts into evidence was not confrontation error. (*Ibid.*)

The first page of the six-page report contained a notation from a nontestifying laboratory assistant, Constantino, that the defendant's blood was labeled with a particular laboratory number. There was no dispute that that notation was admitted for its truth. The first page also contained notations from Pena indicating he had analyzed the blood and determined the defendant's blood sample had a blood-alcohol concentration of .09 percent. Based on Constantino's labeling and the above printouts, Willey independently opined at trial that the defendant's blood contained .09 percent alcohol. (*Lopez, supra,* 55 Cal.4th at pp. 584-585.)

*Lopez* stated, "The notation in question does not meet the high court's requirement that to be testimonial the out-of-court statement must have been made with formality or solemnity. [Citations.] Although here laboratory analyst Pena's initials appear on the same line that shows defendant's name and laboratory assistant Constantino's initials appear at the top of the page to indicate that he entered the notation that defendant's

12

blood sample was given laboratory No. 070-7737, *neither Constantino nor Pena signed, certified, or swore to the truth of the contents of page 1 of the report*. The chart shows only numbers, abbreviations, and one-word entries under specified headings. Thus, the notation on the chart linking defendant's name to blood sample No. 070-7737 is nothing more than an *informal record of data for internal purposes*, as is indicated by the small printed statement near the top of the chart: 'for lab use only.' Such a notation, in our view, is not prepared with the formality required by the high court for testimonial statements." (*Lopez, supra*, 55 Cal.4th at p. 584; italics added, some capitalization omitted.)

*Lopez* concluded the trial court correctly introduced into evidence that portion of the first page of the report reflecting Constantino's notation linking the defendant's name to the laboratory number given to the blood sample, and correctly permitted Willey to testify regarding it. (*Lopez, supra,* 55 Cal.4th at p. 585.) *Lopez* did not conclude that that portion of the first page reflecting Pena's analysis of the blood sample was properly admitted into evidence, but *Lopez* did say, "To the extent that any other notations on the first page of the chart could be considered testimonial, their admission was harmless ' "beyond a reasonable doubt" ' [citation], in light of prosecution witness Willey's independent opinion . . . that defendant's blood sample contained a blood-alcohol concentration of 0.09 percent." (*Ibid*.)

(2) *Application of the Law to this Case*.

Appellant waived the issue of whether Matthies's testimony based on Sherman's report was inadmissible under the confrontation clause because appellant failed to object to that testimony. (Cf. *People v. Alvarez* (1996) 14 Cal.4th 155, 186.)[4]

---

[4] *In re Sheena K.* (2007) 40 Cal.4th 875, cited by appellant and involving a constitutional challenge to a *probation condition*, does not affect "the established rule that a forfeited claim of trial court error *in admitting or excluding evidence* is not subject to discretionary appellate review." (*Id*. at p. 887, fn. 7, italics added.) To the extent appellant claims his trial counsel's failure to object to the challenged testimony denied appellant effective assistance of counsel, the record sheds no light on why appellant's trial counsel failed to act in the manner challenged, the record does not reflect said

13

As to the merits, first, Matthies's testimony, fairly understood, was to the effect that her direct examination testimony pertaining to (1) the vaginal and anal samples from Nicole, (2) the sperm sample collected from the vehicle, (3) the swab taken from appellant, (4) the fact appellant's DNA was found in the samples, and (5) the statistical improbability that that DNA could have belonged to someone else, was based on Sherman's report. However, no evidence was presented that Sherman's report was signed, certified, or sworn. To the extent the report reflects vaginal and anal samples were taken from Nicole and the sperm sample was collected from the vehicle, the record fails to reflect that the report was anything other than an informal record of information for internal purposes. Matthies's testimony about that portion of the report was not confrontation error, because the record fails to demonstrate that that portion of the report was made with the requisite formality or solemnity. (Cf. *Lopez*, *supra*, 55 Cal.4th at pp. 584-585.)

Second, in *Williams,* the high court concluded no confrontation error occurred. Four justices reasoned that extrajudicial statements related by an expert solely to explain assumptions on which the expert's opinion is based are nonhearsay beyond the scope of the confrontation clause, and that the statements in the report at issue in *Williams* were such extrajudicial statements. Justice Thomas reasoned the report was not a statement of a "witnes[s]" within the meaning of the confrontation clause because the report was neither a sworn nor certified declaration of fact, and the report nowhere attested that its statements accurately reflected DNA testing processes used or the results obtained. The reasoning of the four justices and the reasoning of Justice Thomas apply in the present case; therefore, Matthies's testimony did not violate the confrontation clause.[5]

counsel was asked for an explanation and failed to provide one, and we cannot say there simply could have been no satisfactory explanation. We reject appellant's ineffective assistance claim. (See *People v. Slaughter* (2002) 27 Cal.4th 1187, 1219; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.)

[5] The plurality opinion in *Williams* alternatively concluded that the report in that case was not testimonial because it was not prepared for the primary purpose of accusing

Third, Matthies's testimony did not constitute confrontation error in light of the California appellate court cases concluding extrajudicial statements reasonably relied upon as a basis for expert opinion testimony are nonhearsay that does not violate the confrontation clause, a conclusion applicable here. (Cf. *Cooper*, *supra*, 148 Cal.App.4th at p. 747; *Thomas*, *supra*, 130 Cal.App.4th at p. 1209-1210; see fn. 2, *ante*.)[6]

Finally, even if Matthies's challenged testimony violated the confrontation clause, it does not follow that we must reverse the judgment. Matthies's testimony indicated Sherman's report reflected (1) appellant's DNA (collected from a swab taken from him) was found in the vaginal and anal samples taken from Nicole and in the sperm sample collected from the vehicle and (2) the statistical improbability that that DNA could have belonged to someone else. That testimony went to the issue that appellant had vaginal and anal intercourse with Nicole. However, appellant himself testified Nicole sat on top of him and the two had sex. Matthies provided her independent expert testimony that, during her technical review of Sherman's work, Matthies compared the DNA profiles and agreed with Sherman's conclusions. Moreover, independent of Sherman's report, there was substantial and uncontradicted evidence that on August 20, 2009, Nicole was the victim of a violent physical attack resulting in numerous injuries all over her body and her anus was injured.

---

a targeted individual. (See fn. 3, *ante*.) On the other hand, in the present case, appellant was a suspect at the time Campbell took a buccal swab from him and at the time Sherman's report was produced (both events occurred after appellant was arrested). We do not reach the issue of whether *Williams's* alternative conclusion applies in this case or, in particular, whether Sherman's report was inadmissible to the extent it reflected a swab was taken from appellant, his DNA was found in the samples, or the statistical improbability that that DNA could have belonged to someone else.

[6]     *Lopez* did not expressly rely on *Geier's* conclusion--that a laboratory report was not testimonial because it was a contemporaneous recordation of observable events rather than the documentation of past events related to criminal activity (see fn. 1, *ante*) --to uphold the admissibility of challenged evidence in *Lopez*. Neither do we rely on *Geier's* conclusion in this case.

15

Further, the testimony of Ontiveros and the video corroborated Nicole's testimony that after appellant bought liquor from the liquor store, he entered the vehicle, pushed Nicole into the passenger's seat, and drove away. Nicole testified appellant was the person who drove her away and committed the offenses. In light of all of the evidence of appellant's guilt in this case, the alleged confrontation error concerning the DNA evidence was harmless beyond a reasonable doubt. (Cf. *Lopez*, *supra*, 55 Cal.4th at p. 585.)

2. *The Court Did Not Prejudicially Err by Failing to Exclude Evidence of Appellant's Arrest for Rape and Sodomy.*

a. *Pertinent Facts.*

The prosecutor advised the court that if appellant testified, the prosecutor wanted to impeach appellant with evidence he had been arrested for raping his half-sister. Appellant's counsel said he did not want that "because we think that's really bad for our case" and the evidence was irrelevant. The court ruled the prosecutor could impeach appellant with evidence that he had suffered a 1991 arrest for rape, and sodomy of a female, and the court stated it would give a limiting instruction.

As indicated, appellant testified he suffered a 1991 arrest "for the rape and sodomy of a female" and a 1995 Texas conviction for felony house burglary. During its final charge, the court, using a modified CALCRIM No. 303, stated, "During the trial, evidence of defendant's conviction for burglary and arrest for rape and sodomy were [*sic*] admitted for the limited purpose of assessing defendant's credibility. You may consider that evidence only for that purpose and for no other."

b. *Analysis.*

Appellant claims the trial court erroneously failed to exclude, pursuant to Evidence Code section 352, evidence of appellant's arrest for rape, and sodomy of a female. Appellant waived the issue by failing to object on that ground. (Cf. *People v. Clark* (1992) 3 Cal.4th 41, 125-126; Evid. Code, § 353.) As to the merits, "it is established that evidence of mere arrests is inadmissible because it is more prejudicial

than probative. (*People v. Anderson* [(1978) 20 Cal.3d 647,] 650–651; cf. *People v. Medina* (1995) 11 Cal.4th 694, 769 [*Medina*].)" (*People v. Lopez* (2005) 129 Cal.App.4th 1508, 1523.) A witness's credibility is seriously impaired by evidence of a defendant's prior arrests, because such evidence inevitably suggests the defendant's bad character. (*Ibid.*) We assume without deciding the challenged testimony was inadmissible.[7]

However, even if the challenged testimony was inadmissible, it does not follow we must reverse the judgment. The jury heard appellant's testimony that the arrest occurred fully 18 years before the present offenses. The facts of the present offenses were far more incriminating than any suggested by appellant's brief allusion to his arrest. The prosecutor properly impeached appellant with his burglary conviction; therefore, "the jury would not have needed to rely on mere arrests in evaluating the credibility" (*Monterroso, supra,* 34 Cal.4th at p. 778) of appellant. The gist of our rationale as to why any confrontation error was not prejudicial applies here. The court instructed the jury to consider the arrest evidence only on the issue of credibility, and we presume the jury followed that instruction. (Cf. *People v. Sanchez* (2001) 26 Cal.4th 834, 852.) There is no need to reverse the judgment because it is not reasonably probable appellant would not have been convicted of the present offenses absent the alleged error. (Cf. *People v. Watson* (1956) 46 Cal.2d 818, 836.)

---

**7** Respondent argues the challenged testimony was evidence of specific acts of conduct admissible to attack appellant's credibility and to prove conduct. Otherwise admissible impeachment evidence of misconduct is not made inadmissible by the mere fact the misconduct did not result in a conviction, and the admission of such evidence is subject to the trial court's discretion under Evidence Code section 352. (*People v. Wheeler* (1992) 4 Cal.4th 284, 295-297, fn. 7.) However, that does not change the long-standing rule, recognized in the 1995 decision of *Medina* and, more recently, in *People v. Monterroso* (2004) 34 Cal.4th 743, 778 (*Monterroso*), that evidence of mere arrests for impeachment is inadmissible. The challenged testimony was neither offered nor admitted into evidence to prove conduct but was offered and admitted only to impeach appellant.

### *DISPOSITION*

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, J.

We concur:

KLEIN, P. J.

CROSKEY, J.

18